# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRONTLINE FABRICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GULIPEK KUMAS VE IPLIK VE; TD BANK, N.A.; TRUIST BANK; EARLY WARNING SERVICES, LLC; FEDERAL INSURANCE COMPANY; and JOHN DOES 1-10, <br><br> Defendants. | Case No. _____ <br><br> Judge _____ <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Frontline Fabrics, Inc. ("Frontline"), by and through counsel Goldstein Law Partners, LLC, brings this action against Defendants Gulipek Kumas Ve Iplik Ve ("Gulipek Tech"); TD Bank, N.A. ("TD Bank"); Truist Bank ("Truist"); Early Warning Services, LLC ("EWS"); Federal Insurance Company ("Federal"); and John Does 1-10 and alleges as follows:

## INTRODUCTION

1. This case arises from the theft of nearly $1.5 million from Frontline after a hacker or group of hackers ("Hackers") opened a fraudulent bank account in the United States, infiltrated one of Frontline's foreign vendors, and posed as an employee of the foreign vendor.

2. Had it not been for the collective negligence of the foreign vendor and the otherwise-reputable financial institutions that allowed stolen funds to pass freely to

the Hackers, Frontline's money—stolen in six separate fraudulent transactions—could have been returned to Frontline or clawed back.

3. Defendant Federal Insurance Company, Frontline's insurer, refused to cover Frontline's losses despite the existence of social engineering and other applicable coverages.

4. Frontline is seeking recovery from Defendants to recoup the stolen funds, totaling $1,426,476.86.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Frontline and Defendants. Further, Plaintiff has suffered losses in an amount greater than $75,000.00.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District.  Venue is also proper because Defendants are subject to personal jurisdiction in this District.

## PARTIES

7. Plaintiff Frontline Fabrics, Inc. is a Pennsylvania domestic business corporation with a principal place of business within Bucks County, at 5050 Applebutter Road, Pipersville, Pennsylvania 18947. Frontline—a manufacturer of high-quality flame-

resistant products—is co-located on a property with a related company, Tyndale Enterprises, Inc., and the two entities share common minority ownership and several employees. For purposes of 28 U.S.C. § 1332, Frontline is a citizen of Pennsylvania.

8. Defendant Gulipek Kumas Ve Iplik Ve (translated "Gulipek Fabric and Yarn Trade, Inc.") is a technical and flame-retardant yarn spinning mill located in the Turkish province of Bursa, with an address of Nilüferköy Mah. Mudanya Yolu Cad. No:15, 16150 Osmangazi Bursa Turkiye. Until recently, Gulipek Tech was an established vendor for Frontline. For purposes of 28 U.S.C. § 1332, Gulipek Tech is a citizen or subject of Turkey.

9. Defendant TD Bank, N.A. is a financial institution with a principal place of business at 4140 Church Road, Mount Laurel, New Jersey 08054. It is the United States retail business segment and subsidiary of the Canadian corporation TD Bank Group. For purposes of 28 U.S.C. § 1332, TD Bank is a citizen of New Jersey.

10. Defendant Truist Bank is a financial institution with a principal address of 214 North Tryon Street, Charlotte, North Carolina 28202. It is a subsidiary of Truist Financial Corporation, also located in North Carolina. For purposes of 28 U.S.C. § 1332, Truist is a citizen of North Carolina.

11. Defendant Early Warning Services, LLC is a limited liability company organized in Delaware and with a principal place of business at 5801 North Pima Road, Scottsdale, Arizona. EWS, which operates "Zelle," is co-owned by a

number of financial institutions, including Truist. For purposes of 28 U.S.C. § 1332, EWS is a citizen of Delaware and/or Arizona.

12. Defendant Federal Insurance Company is a New Jersey corporation with principal address at 15 Mountain View Road, Warren, New Jersey 07059. It is a member insurer of the Chubb Group of Insurance Companies and a subsidiary of the American-Swiss corporation Chubb Limited. For purposes of 28 U.S.C. § 1332, Federal Insurance is a citizen of New Jersey.

13. Defendant John Does 1-10 are the Hackers who infiltrated Gulipek Tech's computer systems, impersonated a legitimate business contact within Gulipek Tech by using his name and email address, and caused payment instructions to be altered or fabricated so that Frontline's funds were sent to a fraudulent account they controlled. The true names and capacities of the Hackers are unknown to Plaintiff at this time, and Plaintiff reserves the right to amend this Complaint to name the actual persons or entities responsible. For purposes of 28 U.S.C. § 1332, John Does 1-10 are, on information and belief, citizens or subjects of the Republic of Haiti and are not citizens of Pennsylvania.

## FACTUAL ALLEGATIONS

### A. Discovery of Theft

14. On February 21, 2025, one of Frontline's overseas vendors, Gulipek Tech, contacted Frontline asserting that Frontline had failed to pay approximately $291,000

in invoices.

15. Because Frontline's controller, Tiffany Lawler ("Lawler"), had recently resigned, Frontline employees had to access her archived emails and accounting records to investigate Gulipek Tech's claim.

16. On February 25, 2025, after their own review of Lawler's emails and accounting records, Frontline's management concluded that Lawler had caused multiple payments to be issued in Gulipek Tech's name but routed to a different bank account—one recently opened at TD Bank—than Gulipek Tech had historically used.

17. From emails recovered from Lawler's account, it appeared that each of these payments had been prompted by email exchanges between Lawler and Frontline's local contact at Gulipek Tech, Lonnie Braxton ("Braxton") and using Braxton's official Gulipek Tech email address.

18. Lawler's recovered emails further revealed that, just prior to making these payments, Braxton had instructed Lawler—again, using Braxton's official Gulipek Tech email address—to update Gulipek Tech's bank account information from a Turkish bank account to the TD Bank account. This information comported with previous, legitimate communications from Gulipek Tech indicating that Gulipek Tech was opening a bank account in the United States and would be transitioning to this new bank account.

19. On February 25, 2025, in an effort to further investigate this matter, Frontline

contacted Gulipek Tech. Gulipek Tech acknowledged that it was opening a United States bank account, but Gulipek Tech stated that it had not received any of the payments Lawler had made.

20. When Frontline asked Gulipek Tech whether Gulipek Tech's email or computer systems had been compromised, Gulipek Tech stated that it had not detected any issues at that time.

21. Yet, on February 26, 2025, during a meeting between Braxton and Frontline management, Braxton stated that his email address had been accessed by a third party, that the emails sent to Lawler had been sent from his official Gulipek Tech email account, and that he had not received any of Lawler's responses asking questions about invoices or payment confirmations.

22. Furthermore, Braxton disclosed to Frontline management that Gulipek Tech had contacted him that morning to inform him that he needed to change all of his passwords and that Gulipek Tech had added a two-factor identification requirement before Braxton could re-access Gulipek Tech's computer systems.

23. On information and belief, Gulipek Tech's computer systems were accessed by Hackers, who eventually posed as Braxton using Braxton's official email address at Gulipek Tech. These Hackers had sufficient time to monitor Gulipek Tech's plans to open a new bank account in the United States, observe actual exchanges between Gulipek Tech and Frontline, and time their use of Braxton's official email address to

coincide with Gulipek Tech's decision to open a new bank account and to provide a fraudulent bank account instead.

24. On information and belief, the Hackers were not detected by Gulipek Tech at any point prior to February 25, 2025, when Frontline informed Gulipek Tech of the events that had transpired with Braxton and Lawler. Gulipek Tech's failure to detect the Hackers allowed the Hackers to steer Frontline's funds to the fraudulent bank account six separate times over the course of thirty (30) days.

25. Between January 13, 2025, and February 12, 2025, Frontline's systems reflect six released ACH payments to the TD Bank account totaling $1,426,476.86, including: $184,372.13 (January 13, 2025), $196,322.13 (January 15, 2025), $195,002.70 (January 22, 2025), $350,780.00 (January 29, 2025), $295,484.90 (February 7, 2025), and $204,515.00 (February 12, 2025).

26. Each of the ACH payments was made to and for the benefit of "Gulipek Kumas Ve Iplik."

27. On information and belief, TD Bank knew or should have known that the person or persons opening a bank account at TD Bank were not Gulipek Tech and did not represent Gulipek Tech. Instead, TD Bank either failed to require submission of personal identity or corporate authority documentation or failed to properly authenticate such documents.

28. Despite TD Bank's lack of information, material discrepancies in

documentation provided by those opening an account in Gulipek Tech's name, and otherwise suspicious characteristics, TD Bank opened an account and allowed it to receive funds.

29. TD Bank knew or should have known that the recipient and beneficiary of Frontline's ACH payments were not Gulipek Tech and did not represent Gulipek Tech.

30. Nevertheless, TD Bank took custody of these funds and delivered them to the account controlled by Hackers—not Gulipek Tech, the entity listed as the recipient and beneficiary of the ACH payments.

## B. Reporting to Law Enforcement and Attempts to Recover

31. Frontline reported the theft of its funds to local law enforcement on February 25, 2025, and to the Federal Bureau of Investigation ("FBI") on February 26, 2025.

32. On March 24, 2025, Frontline's outside counsel notified TD Bank of the apparent theft and requested TD Bank's assistance in clawing back those funds for return to Frontline. Frontline's outside counsel also requested information concerning TD Bank's efforts, if any, to recover Frontline's funds, whether it had been made aware of any suspicious activity, and whether TD Bank had followed its own policies and procedures in opening the account used to perpetrate the theft.

33. On information and belief, by that time, TD Bank had failed to identify the Hackers, who had already moved funds out of the bank account fraudulently opened

with TD Bank. However, TD Bank could have—but failed to—claw back funds transferred out of the TD Bank account.

34. On information and belief, a person or entity who was not Gulipek Tech opened an account with TD Bank in Gulipek Tech's name, despite having no legitimate connection to Gulipek Tech.

35. On information and belief, TD Bank failed to implement reasonable measures to detect and/or prevent the fraudulent opening and misuse of the bank account opened in Gulipek Tech's name.

36. On information and belief, Truist—Frontline's bank—failed to implement reasonable measures to detect and/or prevent the transfer of funds into a fraudulently opened bank account at TD Bank.

37. In July 2025, after many attempts by Frontline's outside counsel to secure a response from TD Bank and after being told that another attorney would be in touch, TD Bank's outside counsel finally responded to Frontline. Unfortunately, however, TD Bank did not claw back any funds and refused to provide any information to Frontline without a court order.

38. However, through informal conversations with law enforcement, Frontline learned that TD Bank allowed the Hackers and/or others working at the behest of the Hackers to open a bank account in Gulipek Tech's name, despite the lack of legitimate, appropriate, and/or credible credentials.

39. The funds sent by Lawler were transferred out of the TD Bank account to Hackers in Haiti using the Zelle network operated by EWS. Although Zelle "flagged" the transfer(s) as suspicious, TD Bank and/or EWS ultimately allowed the transfer to go through. The Hackers converted Frontline's funds into cryptocurrency, making it difficult if not impossible to trace.

40. In part because of TD Bank's and/or EWS's decision(s) to allow the transfer(s) of funds and/or their failure(s) to prevent such transfer(s)—notwithstanding the transfer(s) being flagged—law enforcement has been unable to fully resolve this matter.

41. In or around November 2025, the FBI was able to locate approximately $100,000 in funds traced back to Frontline. Although the FBI purports to be seeking a warrant to claim these funds, the funds have yet to be claimed and returned to Frontline.

42. Otherwise, no recovery has occurred to date.

**C. Insurance Claims**

43. On April 1, 2025, Frontline formally filed a claim under its insurance policy with Federal Insurance for full coverage as either (1) employee and/or client theft; (2) banking premises theft; (3) forgery; (4) computer system fraud; (5) funds transfer fraud; and/or (6) social engineering fraud. At that time, it was not clear to Frontline whether and to what extent Lawler, Gulipek Tech, or others were helping Hackers

facilitate their theft of Frontline's funds.

44. On November 19, 2025, Federal Insurance denied all claims.

## COUNT I
### Negligence
*(Against TD Bank, EWS)*

45. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

46. TD Bank and EWS owed duties of reasonable care in opening, verifying, and maintaining deposit accounts so as not to facilitate obvious fraud, including implementing reasonable procedures to detect identity misrepresentation and suspicious account activity.

47. TD Bank and EWS also had a duty to follow state and federal laws and regulations applicable to account opening, identity verification, and monitoring for suspicious activity, including, as applicable, Article 4A of the Uniform Commercial Code and the Know Your Customer ("KYC") and Anti-Money Laundering ("AML") regulations, which are designed to ensure that banks verify the identity of their clients and monitor suspicious activity.

48. TD Bank breached its duty by failing to exercise reasonable due diligence in account opening and account monitoring (including detection of suspicious activity) by a person or persons not in fact affiliated with or employed by Gulipek Tech.

49. TD Bank further breached its duty by failing to exercise reasonable due

11

diligence and by failing to recognize the unusual nature of, investigate, or comply with any flags raised as a result of the six (6) large-dollar payments from Frontline to Gulipek Tech.

50. Additionally, TD Bank breached its duty by allowing Hackers to withdraw large sums of money from the fraudulent account and, in so doing, failing to recognize the unusual nature of, investigate, or comply with any flags raised during the Hackers' withdrawal of those funds, including but not limited to the fact that the Hackers were located in Haiti and wished to immediately convert such funds into cryptocurrency.

51. Even if TD Bank reasonably believed that the individual or individuals who opened the TD Bank account were affiliated with or employed by Gulipek Tech, it was unreasonable to allow "Gulipek Kumas Ve Iplik Ve," a Middle Eastern vendor with a newly opened or newly used bank account, to receive unusually large sums of money from a single source over a short period of time, then rapidly withdraw those unusually large sums of money and immediately convert such funds into cryptocurrency.

52. EWS breached its duty by failing to exercise reasonable due diligence in account monitoring, transaction flagging, and/or communicating any concerns to TD Bank and by permitting the transfer of unusually large sums tied to a newly opened or newly used account to Hackers in Haiti who wished to immediately convert such funds into cryptocurrency.

53. Even if EWS reasonably believed that the individual or individuals withdrawing funds were affiliated with or employed by Gulipek Tech, it was unreasonable to allow "Gulipek Kumas Ve Iplik Ve," a Middle Eastern vendor with a newly opened or newly used bank account, to receive unusually large sums of money from a single source over a short period of time, then rapidly withdraw those unusually large sums of money and immediately convert such funds into cryptocurrency.

54. TD Bank's and EWS's negligence increased the entirely foreseeable risk that Hackers would unlawfully take, convert, and deprive Frontline of funds.

55. As a direct and proximate result of TD Bank's and EWS's negligence, Frontline suffered damages in excess of $1,426,476.86.

## COUNT II
### Negligence and/or Breach of Contract
*(Against Truist)*

56. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

57. Truist owed Frontline contractual and common-law duties to exercise ordinary care in providing those services, including commercially reasonable fraud controls appropriate to unusually large outbound transfers and payment destination changes that present obvious fraud risk.

58. Truist also had a duty to follow state and federal rules and regulations governing the transfer of ACH funds, including Article 4A of the Uniform

Commercial Code and the Know Your Customer ("KYC") and Anti-Money Laundering ("AML") regulations, which are designed to ensure that banks verify the identity of their clients and monitor suspicious activity.

59. The transfers, which totaled nearly $1.5 million and far exceeded Frontline's historical payments to Gulipek Tech, should have triggered Truist's fraud controls.

60. On information and belief, Truist breached its duty by failing to employ commercially reasonable monitoring and/or failing to halt, verify, or otherwise respond appropriately before allowing Frontline funds to be transferred to the TD Bank destination account that was, in fact, a Hacker-controlled account.

61. Truist's negligence increased the entirely foreseeable risk that Hackers would unlawfully take, convert, and deprive Frontline of funds.

62. As a direct and proximate result of Truist's negligence, Plaintiff suffered damages in excess of $1,426,476.86.

## COUNT III
### Declaratory Judgment: Violation of Uniform Commercial Code
*(Against TD Bank, Truist, EWS)*

63. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

64. TD Bank, Truist, and EWS are governed in part by Article 4A of the Uniform Commercial Code, which defines the rights and duties of banks and their customers and establishes liability for errors or fraud.

65. In handling Frontline's funds and transmitting them to Hackers, TD Bank, Truist, and EWS violated Article 4A of the Uniform Commercial Code.

66. As a direct and proximate result of TD Bank's, Truist's, and EWS's actions or inactions, Frontline suffered damages in excess of $1,426,476.86.

## COUNT IV
### Negligence
*(Against Gulipek Tech)*

67. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

68. Gulipek Tech was the target of a hacking event in which Hackers used Gulipek Tech's computer systems to monitor communications with Frontline, commandeer Gulipek Tech's email system, and represent to Frontline that they were Gulipek Tech employees.

69. Gulipek Tech and its agents had a duty to exercise reasonable care to secure vendor communications channels used for payment instructions, monitor for any misuse of its computer systems, vigilantly guard against theft of vendor communications, and to promptly warn law enforcement and third parties of any compromise.

70. Gulipek Tech breached its duty by failing to maintain and enforce adequate security measures for its computer systems, failing to timely detect compromise and warn Frontline, and/or failing to assist Frontline in mitigating Frontline's losses.

71. To date, Gulipek Tech has not communicated with Frontline about the nature or extent of the hacking event, to what extent Frontline's data was accessed, or what Frontline should do to protect itself from further harms.

72. Gulipek Tech's negligence increased the entirely foreseeable risk that Hackers would unlawfully take, convert, and deprive Frontline of funds.

73. As a direct and proximate result of Gulipek Tech's negligence, Plaintiff suffered damages in excess of $1,426,476.86.

## COUNT V
### Declaratory Judgment: Breach of Insurance Contract
*(Against Federal Insurance)*

74. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

75. Frontline maintained crime coverage under its policy with Federal Insurance and presented a timely claim for its loss of $1,426,476.86.

76. In fact, the loss should have been covered under applicable insuring agreements—including, as applicable, forgery, computer systems fraud, funds transfer fraud, and/or social engineering fraud—and Federal Insurance should have provided all benefits due under the policy to Frontline. A copy of Frontline's contract with Federal Insurance is attached hereto as Exhibit A.

77. Accordingly, Frontline seeks a declaration that its losses were covered under its policy with Federal Insurance and that Frontline is entitled to receive benefits under

that policy.

78. Furthermore, Frontline seeks payment from Federal Insurance in the amount it is due under its insurance contract with Federal Insurance.

## COUNT VI
### Conversion
*(Against John Does 1-10)*

79. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

80. Frontline had ownership and legal title to $1,426,476.86.

81. However, the Hackers intentionally took and refused to return the $1,426,476.86 to Frontline, depriving Frontline of its use.

82. As a result, Frontline suffered harm in the amount of $1,426,476.86.

## COUNT VII
### Identity Theft (42 Pa.C.S. § 8315)
*(Against John Does 1-10)*

83. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

84. The Hackers intentionally used the identifying information of Frontline's contact at Gulipek Tech, Braxton, including but not limited to his name and email address, without the consent of Braxton.

85. The Hackers used Braxton's identifying information to further an unlawful purpose, namely, the theft of $1,426,476.86 from Frontline.

## PRAYER FOR RELIEF

WHEREFORE, Frontline respectfully requests this Honorable Court to:

a) Award damages to Frontline and against all Defendants in the amount of $1,426,476.86, together with pre-judgment and post-judgment interest, and attorneys' fees and costs where permitted by law;

b) Award treble damages and reasonable attorneys' fees and costs against John Does 1-10 pursuant to 42 Pa.C.S. § 8315;

c) Enter an order requiring disgorgement and restitution by any Defendant or third party found to have been unjustly enriched by receipt of Plaintiff's funds;

d) Award punitive damages against those Defendants whose conduct is found to be wanton, willful, fraudulent or malicious;

e) Issue injunctive relief as necessary to preserve funds and records (including an injunction preventing dissipation or transfer of any funds currently traceable to the fraudulent activity and requiring preservation of bank records); and

f) Award such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters triable by jury pursuant to Federal Rule of Civil Procedure 38.

                Respectfully submitted,

                GOLDSTEIN LAW PARTNERS, LLC

Dated: December 26, 2025 

                **Jonathan Goldstein**
                Pa. Attorney I.D. No. 201627
                Email: jgoldstein@goldsteinlp.com
                **David R. Osborne**
                Pa. Attorney I.D. No. 318024
                Email: dosborne@goldsteinlp.com
                GOLDSTEIN LAW PARTNERS, LLC
                200 School Alley, Suite 5
                Green Lane, PA 18054
                Telephone: 610-949-0444
                Facsimile: 215-257-1910
                *Counsel for Plaintiff*