**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FRONTLINE FABRICS, INC.,
Plaintiff,
v.
GULIPEK KUMAS VE IPLIK VE; TD BANK, N.A.; TRUIST BANK; and JOHN DOES 1-10,
Defendants.

**Case No. 2:25-cv-07342-KSM**

Judge Karen Spencer Marston

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Frontline Fabrics, Inc. ("Frontline"), by and through counsel Goldstein Law Partners, LLC, brings this action against Defendants Gulipek Kumas Ve Iplik Ve ("Gulipek Tech"); TD Bank, N.A. ("TD Bank"); Truist Bank ("Truist"); and John Does 1-10 and alleges as follows:

## INTRODUCTION

1. This case arises from the theft of nearly $1.5 million from Frontline after a hacker or group of hackers ("Hackers") opened a fraudulent bank account in the United States, infiltrated one of Frontline's foreign vendors, and posed as an employee of the foreign vendor.

2. Had it not been for the collective negligence of the foreign vendor, the otherwise-reputable financial institutions, and TD Bank's handling of payment orders in violation of the Uniform Commercial Code ("UCC") that allowed stolen funds to pass freely to the Hackers, Frontline's money—stolen in six separate fraudulent

transactions—could have been returned to Frontline or clawed back.

3. Frontline is seeking recovery from Defendants to recoup the stolen funds, totaling $1,426,476.86.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Frontline and Defendants. Further, Plaintiff has suffered losses in an amount greater than $75,000.00.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District. Venue is also proper because Defendants are subject to personal jurisdiction in this District.

## PARTIES

6. Plaintiff Frontline Fabrics, Inc. is a Pennsylvania domestic business corporation with a principal place of business within Bucks County, at 5050 Applebutter Road, Pipersville, Pennsylvania 18947. Frontline—a manufacturer of high-quality flame-resistant products—is co-located on a property with a related company, Tyndale Enterprises, Inc., and the two entities share common minority ownership and several employees. For purposes of 28 U.S.C. § 1332, Frontline is a citizen of Pennsylvania.

7. Defendant Gulipek Kumas Ve Iplik Ve (translated "Gulipek Fabric and Yarn

Trade, Inc.") is a technical and flame-retardant yarn spinning mill located in the Turkish province of Bursa, with an address of Nilüferköy Mah. Mudanya Yolu Cad. No:15, 16150 Osmangazi Bursa Turkiye. Until recently, Gulipek Tech was an established vendor for Frontline. For purposes of 28 U.S.C. § 1332, Gulipek Tech is a citizen or subject of Turkey.

8. Defendant TD Bank, N.A. is a financial institution with headquarters at 4140 Church Road, Mount Laurel, New Jersey 08054. It is the United States retail business segment and subsidiary of the Canadian corporation TD Bank Group. For purposes of 28 U.S.C. § 1332, TD Bank is a citizen of New Jersey.

9. Defendant Truist Bank is a financial institution with a principal address of 214 North Tryon Street, Charlotte, North Carolina 28202. It is a subsidiary of Truist Financial Corporation, also located in North Carolina. For purposes of 28 U.S.C. § 1332, Truist is a citizen of North Carolina.

10. Defendant John Does 1-10 are the Hackers who infiltrated Gulipek Tech's computer systems, impersonated a legitimate business contact within Gulipek Tech by using his name and email address, and caused payment instructions to be altered or fabricated so that Frontline's funds were sent to a fraudulent account they controlled. The true names and capacities of the Hackers are unknown to Plaintiff at this time, and Plaintiff reserves the right to amend this First Amended Complaint to name the actual persons or entities responsible. For purposes of 28 U.S.C. § 1332, John Does 1-

10 are, on information and belief, citizens or subjects of the Republic of Haiti and are not citizens of Pennsylvania.

## FACTUAL ALLEGATIONS

### A. Discovery of Theft

11. On February 21, 2025, one of Frontline's overseas vendors, Gulipek Tech, contacted Frontline asserting that Frontline had failed to pay approximately $291,000 in invoices.

12. Because Frontline's controller, Tiffany Lawler ("Lawler"), had recently resigned, Frontline employees had to access her archived emails and accounting records to investigate Gulipek Tech's claim.

13. On February 25, 2025, after their own review of Lawler's emails and accounting records, Frontline's management concluded that Lawler had caused multiple payments to be issued in Gulipek Tech's name but routed to a different bank account—one recently opened at TD Bank—than Gulipek Tech had historically used.

14. From emails recovered from Lawler's account, it appeared that each of these payments had been prompted by email exchanges between Lawler and Frontline's local contact at Gulipek Tech, Lonnie Braxton ("Braxton") and using Braxton's official Gulipek Tech email address.

15. Lawler's recovered emails further revealed that, just prior to making these payments, Braxton had instructed Lawler—again, using Braxton's official Gulipek

Tech email address—to update Gulipek Tech's bank account information from a Turkish bank account to the TD Bank account. This information comported with previous, legitimate communications from Gulipek Tech indicating that Gulipek Tech was opening a bank account in the United States and would be transitioning to this new bank account.

16. On February 25, 2025, in an effort to further investigate this matter, Frontline contacted Gulipek Tech. Gulipek Tech acknowledged that it was opening a United States bank account, but Gulipek Tech stated that it had not received any of the payments Lawler had made.

17. When Frontline asked Gulipek Tech whether Gulipek Tech's email or computer systems had been compromised, Gulipek Tech stated that it had not detected any issues at that time.

18. Yet, on February 26, 2025, during a meeting between Braxton and Frontline management, Braxton stated that his email address had been accessed by a third party, that the emails sent to Lawler had been sent from his official Gulipek Tech email account, and that he had not received any of Lawler's responses asking questions about invoices or payment confirmations.

19. Furthermore, Braxton disclosed to Frontline management that Gulipek Tech had contacted him that morning to inform him that he needed to change all of his passwords and that Gulipek Tech had added a two-factor identification requirement

before Braxton could re-access Gulipek Tech's computer systems.

20. On information and belief, Gulipek Tech's computer systems were accessed by Hackers, who eventually posed as Braxton using Braxton's official email address at Gulipek Tech. These Hackers had sufficient time to monitor Gulipek Tech's plans to open a new bank account in the United States, observe actual exchanges between Gulipek Tech and Frontline, and time their use of Braxton's official email address to coincide with Gulipek Tech's decision to open a new bank account and to provide a fraudulent bank account instead.

21. On information and belief, the fraudulent bank account controlled by the Hackers was opened by a Pennsylvania woman, Lisa Ann Gray ("Gray"), who was tricked by Hackers into opening up business and personal bank accounts at five different banks—two accounts at Truist, two at Citizens Bank, two at Citibank, two at Wells Fargo, and two at TD Bank.

22. On information and belief, each bank account Gray opened was opened in her real name.

23. On information and belief, the Hackers directed Gray to move substantial funds in and out of the accounts she opened by leading her to believe that she was in a romantic relationship with someone who needed her to take these actions.

24. On information and belief, the Hackers were not detected by Gulipek Tech at any point prior to February 25, 2025, when Frontline informed Gulipek Tech of the

events that had transpired with Braxton and Lawler. Gulipek Tech's failure to detect the Hackers allowed the Hackers to steer Frontline's funds to the fraudulent bank account six separate times over the course of thirty (30) days.

25. Between January 13, 2025, and February 12, 2025, Frontline's systems reflect six released ACH payments to one of the TD Bank accounts (ending in 6656) believed to be operated by Gray at the direction of the Hackers, totaling $1,426,476.86, including: $184,372.13 (January 13, 2025), $196,322.13 (January 15, 2025), $195,002.70 (January 22, 2025), $350,780.00 (January 29, 2025), $295,484.90 (February 7, 2025), and $204,515.00 (February 12, 2025).

26. Each of the ACH payments was made to and for the benefit of "Gulipek Kumas Ve Iplik" and identified by account number the TD Bank account supplied in the fraudulent payment instructions.

27. As further developed below, on information and belief, TD Bank knew that the recipient and beneficiary of Frontline's ACH payments were not Gulipek Tech and did not represent Gulipek Tech. Frontline pleads this fact on information and belief because the details of TD Bank's internal review, transaction routing, and employee access are within TD Bank's possession, while the records obtained by Frontline to date from TD Bank and other banks show discovery of mismatches by TD Bank and other banks on other accounts.

28. In fact, on information and belief, TD Bank and other banks noticed that Gray

was engaged in suspicious conduct. For example, on February 10, 2025, two wires previously sent from another TD Bank account opened in Gray's name (ending in 5204) were returned and credited back to that account. A $294,000 wire was returned, minus a $45 fee, as was noted "UNABLE TO APPLY BENEFICIARY DETAILS MISMATCH." A separate $250,000 wire was returned with the notation "OFFBOARDED – SCAM EXPOSURE."

29. Nevertheless, TD Bank took custody of the funds sent by Frontline and delivered them to the account controlled by Hackers and opened in Gray's name—not Gulipek Tech, the entity listed as the recipient and beneficiary of the ACH payments.

**B. Reporting to Law Enforcement and Attempts to Recover**

30. Frontline reported the theft of its funds to local law enforcement on February 25, 2025, and to the Federal Bureau of Investigation ("FBI") on February 26, 2025.

31. On March 24, 2025, Frontline's outside counsel notified TD Bank of the apparent theft and requested TD Bank's assistance in clawing back those funds for return to Frontline. Frontline's outside counsel also requested information concerning TD Bank's efforts, if any, to recover Frontline's funds, whether it had been made aware of any suspicious activity, and whether TD Bank had followed its own policies and procedures in opening the account used to perpetrate the theft.

32. On information and belief, by that time, TD Bank had failed to identify the

Hackers, who had already moved funds out of the bank account fraudulently opened with TD Bank. However, TD Bank could have—but failed to—claw back funds transferred out of the TD Bank account.

33. On information and belief, Gray, a person who was not Gulipek Tech or a representative of Gulipek Tech, opened an account with TD Bank and received ACH transfers from Frontline naming Gulipek Tech as beneficiary, despite the account having no legitimate connection to Gulipek Tech.

34. On information and belief, Truist—Frontline's bank—failed to implement reasonable measures to detect and/or prevent the transfer of funds into a fraudulently opened bank account at TD Bank.

35. In July 2025, after many attempts by Frontline's outside counsel to secure a response from TD Bank and after being told that another attorney would be in touch, TD Bank's outside counsel finally responded to Frontline. Unfortunately, however, TD Bank did not claw back any funds and refused to provide any information to Frontline without a court order.

36. The funds sent by Lawler were transferred out of the TD Bank account in several transactions, ultimately to Hackers in Haiti.

37. Because the Hackers moved Frontline's funds through multiple subsequent transactions and converted the funds into cryptocurrency, law enforcement has been unable to fully recover Frontline's loss.

38. In or around November 2025, the FBI was able to locate approximately $100,000 in funds traced back to Frontline. Although the FBI purports to be seeking a warrant to claim these funds, the funds have yet to be claimed and returned to Frontline.

39. Otherwise, Frontline has not recovered the full amount of its $1,426,476.86 loss.

### C. Insurance Claims

40. On April 1, 2025, Frontline formally filed a claim under its insurance policy with Federal Insurance for full coverage as either (1) employee and/or client theft; (2) banking premises theft; (3) forgery; (4) computer system fraud; (5) funds transfer fraud; and/or (6) social engineering fraud. At that time, it was not clear to Frontline whether and to what extent Lawler, Gulipek Tech, or others were helping Hackers facilitate their theft of Frontline's funds.

41. On November 19, 2025, Federal Insurance denied all claims.

## COUNT I
## Negligence and/or Breach of Contract
(*Against Truist*)

42. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

43. Truist owed Frontline contractual and common-law duties to exercise ordinary care in providing those services, including commercially reasonable fraud controls

appropriate to unusually large outbound transfers and payment destination changes that present obvious fraud risk.

44. Truist also had a duty to follow state and federal rules and regulations governing the transfer of ACH funds, including Article 4A of the Uniform Commercial Code and the Know Your Customer ("KYC") and Anti-Money Laundering ("AML") regulations, which are designed to ensure that banks verify the identity of their clients and monitor suspicious activity.

45. The transfers, which totaled nearly $1.5 million and far exceeded Frontline's historical payments to Gulipek Tech, should have triggered Truist's fraud controls.

46. On information and belief, Truist breached its duty by failing to employ commercially reasonable monitoring and/or failing to halt, verify, or otherwise respond appropriately before allowing Frontline funds to be transferred to the TD Bank destination account that was, in fact, a Hacker-controlled account.

47. Truist's negligence increased the entirely foreseeable risk that Hackers would unlawfully take, convert, and deprive Frontline of funds.

48. As a direct and proximate result of Truist's negligence, Plaintiff suffered damages in excess of $1,426,476.86.

## COUNT II

**Declaratory Judgment: Violation of Uniform Commercial Code**

(*Against TD Bank, Truist*)

49. The foregoing paragraphs are incorporated by reference as if set forth fully

herein.

50. The six ACH credit transfers at issue are "funds transfers" governed by Article 4A of Pennsylvania's UCC. *See* 13 Pa.C.S. §§ 4A102–4A105. Frontline was the originator of the transfers, Truist was the originator's bank, and TD Bank was the beneficiary's bank.

51. Section 4A207(b)(1) permits a beneficiary's bank to rely on the account number only if the bank does not know that the beneficiary name and account number identify different persons. Section 4A207(b)(2) provides that when the beneficiary's bank knows of the mismatch, no person has rights as beneficiary except a person paid by the beneficiary's bank who was entitled to receive payment from the originator; if no person has rights as beneficiary, acceptance of the payment order cannot occur.

52. Gray and the Hackers were not entitled to receive payment from Frontline. Frontline intended each payment exclusively for Gulipek Tech in satisfaction of legitimate invoices owed to Gulipek Tech.

53. On information and belief, before accepting one or more of Frontline's payment orders, including the February 12, 2025 payment order, one or more TD Bank employees responsible for reviewing or accepting the payment order had actual knowledge that the named beneficiary, Gulipek Tech, and the holder of the numbered account were different persons.

54. Frontline pleads TD Bank's actual knowledge on information and belief

because the identity of the TD Bank personnel who reviewed Gray's accounts, the scope of TD Bank's internal review, and the information available to those personnel are peculiarly within TD Bank's possession. However, the records obtained to date show that, by February 10, 2025, TD Bank possessed account-specific records concerning Gray that contained beneficiary mismatch and scam exposure notations on other transactions.

55. To the extent TD Bank credited and treated as accepted any Frontline payment order after obtaining actual knowledge that the beneficiary name and account number identified different persons, TD Bank acted contrary to 13 Pa.C.S. § 4A207(b)(2). Under that provision, acceptance could not occur, and any purported acceptance under 13 Pa.C.S. § 4A209 was ineffective.

56. Accordingly, Frontline seeks a declaration that, for each transfer, Gray and the Hackers were not entitled to receive payment from Frontline, no person had rights as beneficiary under section 4A207(b)(2), TD Bank's purported acceptance therefore could not occur, and Frontline is entitled to a refund of one or more of its ACH transfers, totaling $1,426,476.86.

57. In the alternative—that is, if TD Bank did not have actual knowledge of the mismatch—section 4A207(c)(2) separately governs Frontline's payment obligation. Under section 4A207(c)(2), Frontline was not obligated to fund the payment orders unless Truist proves that, before acceptance, Frontline received the statutory notice

that payment of an order might be made by reference to an account number even if the number identified a person different from the named beneficiary.

58. Frontline did not receive or sign before acceptance of the payment orders a record providing the notice described in 13 Pa.C.S. § 4A207(c)(2) that payment might be made on the basis of an account number even if the number identified a person different from the named beneficiary.

59. Therefore, Frontline also seeks a declaration that, to the extent it was not obliged to pay one or more of its payment orders, Truist is obligated to refund Frontline through Article 4A's statutory payment chain in an amount equal to one or more of the ACH transfers totaling $1,426,476.86. *See* 13 Pa.C.S. § 4A402(d).

**COUNT III**
**Negligence**
(*Against Gulipek Tech*)

60. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

61. Gulipek Tech was the target of a hacking event in which Hackers used Gulipek Tech's computer systems to monitor communications with Frontline, commandeer Gulipek Tech's email system, and represent to Frontline that they were Gulipek Tech employees.

62. Gulipek Tech and its agents had a duty to exercise reasonable care to secure vendor communications channels used for payment instructions, monitor for any

misuse of its computer systems, vigilantly guard against theft of vendor communications, and to promptly warn law enforcement and third parties of any compromise.

63. Gulipek Tech breached its duty by failing to maintain and enforce adequate security measures for its computer systems, failing to timely detect compromise and warn Frontline, and/or failing to assist Frontline in mitigating Frontline's losses.

64. To date, Gulipek Tech has not communicated with Frontline about the nature or extent of the hacking event, to what extent Frontline's data was accessed, or what Frontline should do to protect itself from further harms.

65. Gulipek Tech's negligence increased the entirely foreseeable risk that Hackers would unlawfully take, convert, and deprive Frontline of funds.

66. As a direct and proximate result of Gulipek Tech's negligence, Plaintiff suffered damages in excess of $1,426,476.86.

**COUNT IV**
**Conversion**
(*Against John Does 1-10*)

67. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

68. Frontline had ownership and legal title to $1,426,476.86.

69. However, the Hackers intentionally took and refused to return the $1,426,476.86 to Frontline, depriving Frontline of its use.

70. As a result, Frontline suffered harm in the amount of $1,426,476.86.

**COUNT V**
**Identity Theft (42 Pa.C.S. § 8315)**
(*Against John Does 1-10*)

71. The foregoing paragraphs are incorporated by reference as if set forth fully herein.

72. The Hackers intentionally used the identifying information of Frontline's contact at Gulipek Tech, Braxton, including but not limited to his name and email address, without the consent of Braxton.

73. The Hackers used Braxton's identifying information to further an unlawful purpose, namely, the theft of $1,426,476.86 from Frontline.

**PRAYER FOR RELIEF**

WHEREFORE, Frontline respectfully requests this Honorable Court to:

a) Enter a declaratory judgment concerning Frontline's rights and Defendants' obligations under UCC Article 4A;

b) Award damages and/or statutory refund relief to Frontline and against appropriate Defendants in the total amount of $1,426,476.86, together with pre-judgment and post-judgment interest, and attorneys' fees and costs where permitted by law;

c) Award treble damages and reasonable attorneys' fees and costs against John Does 1-10 pursuant to 42 Pa.C.S. § 8315;

d) Enter an order requiring disgorgement and restitution by any Defendant or third party found to have been unjustly enriched by receipt of Plaintiff's funds;

e) Award punitive damages against those Defendants whose conduct is found to be wanton, willful, fraudulent or malicious;

f) Issue injunctive relief as necessary to preserve funds and records (including an injunction preventing dissipation or transfer of any funds currently traceable to the fraudulent activity and requiring preservation of bank records); and

g) Award such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters triable by jury pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

GOLDSTEIN LAW PARTNERS, LLC

Dated: August 21, 2026

**Jonathan Goldstein**
Pa. Attorney I.D. No. 201627
Email: jgoldstein@goldsteinlp.com
**David R. Osborne**
Pa. Attorney I.D. No. 318024
Email: dosborne@goldsteinlp.com
GOLDSTEIN LAW PARTNERS, LLC

200 School Alley, Suite 5
Green Lane, PA 18054
Telephone: 610-949-0444
Facsimile: 215-257-1910
*Counsel for Plaintiff*