**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FRONTLINE FABRICS, INC.,** et al., | **CIVIL ACTION** |
| Plaintiff, | **No. 25-7342-KSM** |
| ***v.*** | |
| **GÜLIPEK KUMAS VE IPLIK VE,** et al., | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.** **September 1, 2026**

Plaintiff Frontline Fabrics, Inc. lost $1.4 million when hackers infiltrated one of its foreign vendors, opened a United States bank account in the vendor's name, and posing as an employee of the vendor, directed Frontline to route payments to the fraudulent account. (Doc. No. 1.) Frontline brings this suit against the foreign vendor, Gülipek Kumas Ve İplik Ve ("Gülipek Tech"); the financial institutions that were used to transfer the money, TD Bank, N.A., and Truist Bank; Frontline's insurance company, Federal Insurance Company; and the "John Doe" hackers. (Doc. No. 1 at 3–4.) Gülipek Tech has moved to dismiss the negligence claim asserted against it, arguing that this Court lacks personal jurisdiction over it; that even if the Court has jurisdiction, we should decline to exercise it; and that Frontline has failed to state a claim for negligence against Gülipek Tech. (Doc. No. 25.) For the reasons discussed below, that motion is granted.

## I. BACKGROUND

Plaintiff Frontline Fabrics, Inc. is a Pennsylvania corporation that manufactures flame-resistant products. (Doc. No. 1 at ¶ 7.) It purchases the flame-retardant yarn used in its products from Defendant Gülipek Tech, which operates a spinning mill in Türkiye. (*Id.*) Gülipek Tech is

incorporated in Türkiye, and its sole registered office and principal place of business are in Türkiye. (Doc. No. 25-2 at ¶ 4 ("Gülgeç Decl.").[1]) Its manufacturing operations, production facilities, yarn-spinning equipment, and warehousing are located exclusively in Türkiye. (*Id.* at ¶ 6.) Frontline is one of only a handful of United States-based companies that purchases yarn from Gülipek Tech (*id.* at ¶ 12), and it has been purchasing yarn from Gülipek Tech for a little more than two years (Doc. No. 27-1 at ¶ 4 ("DiGirolamo Decl.")).

On February 21, 2025, Gülipek Tech contacted Frontline because Frontline had failed to pay approximately $291,000 owed in invoices. (Doc. No. 1 at ¶ 8.) When Frontline investigated whether it had missed any payments to Gülipek Tech, it found that former Frontline controller Tiffany Lawler had sent multiple payments totaling $1,426,476.86, to a recently opened TD Bank account, instead of to the company's long-used Turkish bank account. (*Id*. at ¶ 16.) Lawler's email records showed that she had been instructed to update Gülipek Tech's banking information by Lonnie Braxton, Frontline's United States contact at Gülipek Tech. (*Id*. at ¶ 18.) The instructions to modify the payment procedure were sent from Braxton's official Gülipek Tech email address and were consistent with previous communications between Frontline and Gülipek Tech about the latter company's intentions to open an American bank account. (*Id*.)

Frontline shared its findings with Gülipek Tech, which acknowledged that it did intend to open an American bank account, but had yet to do so. (*Id.* at ¶ 19.) Gülipek Tech also noted that it had not received any of the payments issued by Lawler and had not detected any internal security issues that would explain how Lawler received the fraudulent emails. (*Id*.) The next

[1] When ruling on a motion to dismiss for lack of personal jurisdiction, the Court may look beyond the pleadings and consider "'sworn affidavits or other competent evidence' related to personal jurisdiction." *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 183 (D. Del. 2000) (quoting *Patterson v. Fed. Bureau of Inv.*, 893 F.2d 595 (3d Cir. 1990)).

day, however, Frontline management spoke with Braxton, who admitted that his company email address had been breached by a third party. (*Id.* at ¶ 21.) Braxton also confirmed that the emails Lawler received were sent from his official company email account, but he denied receiving any of Lawler's recent messages with questions about invoices and payment confirmations. (*Id.*)

Based on these findings, Frontline concluded that Gülipek Tech's computer systems had been accessed by hackers, who monitored Braxton's correspondence long enough to note Gülipek Tech's plans to open a bank account in the United States. (*Id.* at ¶ 23.) Using this intel and Braxton's company email address, the hackers then deceived Frontline into sending payments to a TD Bank account opened by the hackers in Gülipek Tech's name. (*Id.*) Between January 13, 2025, and February 12, 2025, Frontline released six ACH payments, totaling $1,426,476.86, to that account: $184,372.13 (January 13), $196,322.13 (January 15), $195,002.70 (January 22), $350,780.00 (January 29), $295,484.90 (February 7), and $204,515.00 (February 12). (*Id.* at ¶ 25.) The funds were then transferred out of the hacker's TD Bank account to an account in Haiti, at which point they were converted to cryptocurrency and became virtually impossible to trace. (*Id.* at ¶ 39; *see also id.* at ¶ 42 (alleging that the FBI was able to locate only around $100,000 of the stolen funds).)

On December 26, 2025, Frontline filed this action against Gülipek Tech, TD Bank, Truist Bank (Frontline's bank), Federal Insurance Company (Frontline's insurance company), and the "John Doe" hackers. (Doc. No. 1.) It brings a single claim for negligence against Gülipek Tech. (*Id.* at 15–16 (Count IV).) Gülipek Tech moves to dismiss that claim, arguing lack of personal jurisdiction, forum non conveniens, and failure to state a claim. (Doc. No. 25.) Frontline

opposes the motion. (Doc. No. 27.) The Court held oral argument on July 8, 2025, and the motion is now ripe for resolution.[2]

## II. LEGAL STANDARD

Gülipek Tech moves for dismissal under Federal Rule of Civil Procedure 12(b)(2) and Rule 12(b)(6).

### A. Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "The burden of demonstrating the facts that establish personal jurisdiction falls on the plaintiff," *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal quotation marks and citations omitted), and the plaintiff must do so with "'reasonable particularity,'" *Batista v. O'Jays, Inc.*, Civil Action No. 18-0636, 2019 WL 400060, at *3 (E.D. Pa. Jan. 30, 2019) (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.3d 1217, 1223 (3d Cir. 1992)). When a court does not hold an evidentiary hearing, as is the case here,[3] the plaintiff need only state a prima facie case of personal jurisdiction. *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009); *Metcalfe*, 566 F.3d at 330.

In reviewing a Rule 12(b)(2) motion, "'a court must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.'" *Lionti v. Dipna, Inc.*,

[2] On August 11, 2026, the Court ruled on the motion to dismiss filed by Defendant TD Bank and gave Plaintiff the opportunity to amend its claims against TD Bank. (*See* Doc. Nos. 39–40.) Consistent with that Order, Plaintiff filed its Amended Complaint on August 21, 2026. (Doc. No. 41.) The Amended Complaint does not alter Plaintiff's allegations or claims as to Gülipek Tech, so the motion to dismiss is not moot.

[3] Although Frontline requested jurisdictional discovery in the alternative to dismissal in its briefing (Doc. No. 27 at 7 n.1), at oral argument, both parties agreed that jurisdictional discovery is not needed, and the Court may decide personal jurisdiction from the parties' submission (July 8, 2026 Hr'g. Tr. at 4:184–25, 28:13–16).

Civil Action No. 17-01678, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)); *see also Metcalfe*, 566 F.3d at 330; *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). Nonetheless, "once a defendant has raised a jurisdictional defense, the plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe*, 566 F.3d at 330. The plaintiff may not merely rely on the allegations in the complaint. *See Liontl*, 2017 WL 2779576, at *1 ("The plaintiff may not rely on the bare pleadings alone in order to withstand a defendant's motion to dismiss for lack of personal jurisdiction; instead, the plaintiff must present competent evidence, such as sworn affidavits, to support its jurisdictional allegations. The plaintiff must respond to the defendant's motion with actual proofs; affidavits which parrot and do no more than restate the plaintiff's allegations . . . do not end the inquiry." (internal quotation marks and citations omitted)); *Pendergrass-Walker v. Guy M. Turner, Inc.*, Civil Action No. 16-5630, 2017 WL 2672634, at *3 (E.D. Pa. June 21, 2017) ("When a defendant raises the defense of the court's lack of personal jurisdiction, the plaintiff bears the burden of coming forward with sufficient facts to establish that jurisdiction is proper. To meet this burden, a plaintiff may not rest on mere allegations in the complaint, but must support the jurisdictional allegations with affidavits or other competent evidence." (internal quotation marks and citations omitted)).

**B. Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a plaintiff does not need to include "detailed factual allegations" to survive a Rule 12(b)(6) motion, the plaintiff must

"provide the grounds of his entitlement to relief" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted).

In ruling on a motion to dismiss, the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations. *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "As a general matter," the court "may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up).

## III. DISCUSSION

Frontline asserts a single claim of negligence against Gülipek Tech in Count IV of the Complaint. (Doc. No. 1 at 15–16.) Gülipek Tech moves to dismiss that count, arguing that the Court lacks personal jurisdiction over it, that Türkiye presents a more convenient forum, and that Frontline has failed to state a claim for negligence. (Doc. No. 25.) The Court addresses each argument in turn.

### A. Personal Jurisdiction

Gülipek Tech argues that the claim against it should be dismissed under Rule 12(b)(2) because the Court lacks personal jurisdiction. (Doc. No. 25-1 at 12–17.) A district court may exercise personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state in which the court sits. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); *see also Mellon Bank*, 960 F.2d at 1221. Pennsylvania's long-arm statute authorizes courts to assert personal jurisdiction to the fullest extent allowed under the United States Constitution. 42 Pa. Stat. & Cons. Stat. Ann. § 5322(b); *see also D'Jamoos ex rel. Est. of*

*Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009); *O'Connor*, 496 F.3d at 316. Under the Due Process Clause of the Fourteenth Amendment, for a court to exercise personal jurisdiction over a non-resident defendant, the defendant must "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (citation omitted).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *O'Connor*, 496 F.3d at 317. "General jurisdiction is all-purpose" in that it "allow[s] a court to exercise jurisdiction over the defendant for any claim lodged against that party." *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*, 15cv00965, 2020 WL 1526940, at *3 (W.D. Pa. Mar. 31, 2020). Because Gülipek Tech is a citizen of Türkiye and is not at home in Pennsylvania, it is not subject to the general jurisdiction of this Court.

Specific jurisdiction exists where the claims arise from or relate to the defendant's contacts with the forum state. *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998). "The inquiry . . . focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014). In general, to determine whether specific jurisdiction exists, courts consider whether (1) the defendant "purposefully directed its activities at the forum"; (2) the litigation "arise[s] out of or relate[s] to at least one of those activities"; and (3) if "the exercise of jurisdiction otherwise comports with fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (quotation marks and citations omitted); *see also D'Jamoos*, 566 F.3d at 102. All three prongs are satisfied here.

***Purposeful Contact.*** First, the Court considers whether Gülipek Tech has "purposefully directed its activities" at Pennsylvania. *O'Connor*, 496 F.3d at 317. "Purposeful contact exists

where a defendant 'deliberately reaches into Pennsylvania to target its citizens.'" *Weiser Law Firm, P.C. v. Hartleib*, No. 23cv1889, 2024 WL 5219737, at *3 (3d Cir. Dec. 26, 2024) (quoting *O'Connor*, 496 F.3d at 318). "Communications sent 'into the forum may count toward the minimum contacts that support jurisdiction.'" *Weiser Law Firm, P.C.*, 2024 WL 5219737, at *3 (quoting *Grand Entmt. Grp. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993)). "And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the state—either by the defendant in person or through an agent, goods or mail or some other means—is certainly a relevant contact." *Walden*, 571 U.S. at 285 (cleaned up).

The Court has no trouble finding that test met here. Frontline has shown that Gülipek Tech "was an established overseas vendor for Frontline" for more than two years (Doc. No. 27-1 at ¶ 4 (attesting that "hundreds of thousands of dollars" were "transacted during that time")), and throughout that relationship, Gülipek Tech consistently communicated with Frontline about products, shipping, and payments, via email (*id.* at ¶ 5; Doc. No. 27-2 (email correspondence between Frontline and Gülipek Tech employees, Magdalena Tosun and Lonnie Braxton)). *See N. Penn Gas Co. v. Corning Nat'l Gas Corp.*, 897 F.2d 687, 691 (3d Cir. 1990) ("The delivery of monies and communications into Pennsylvania by Corning were more than merely consequential. Such activities lend validity to a finding of a substantial connection by Corning to Pennsylvania, the forum state. Further, Corning and North Penn had an ongoing business relationship for over 30 years, entailing continuing obligations between the parties.").

Gülipek Tech argues that these contacts are insufficient because "a defendant's contacts must be attributable to its own purposeful conduct directed at the forum—not merely the consequence of a commercial relationship with a party that happens to reside there." (Doc. No. 25-1 at 13 (citing *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014) and *Hanson v. Denckla*, 357

U.S. 235, 253 (1958)).) In other words, Gülipek Tech seems to argue that a single commercial relationship can *never*, on its own, amount to the purposeful contacts necessary to establish personal jurisdiction. (*See id.* ("[T]he existence of a commercial relationship with a buyer located in the forum does not, without more, constitute purposeful availment of the forum's laws . . . ."). But the Supreme Court has long "rejected the notion that personal jurisdiction might turn on 'mechanical' tests." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (quotation marks omitted). And in *Burger King*, the Court found that the parties' single franchise agreement supported a finding that the defendant purposefully directed its conduct to Florida. In reaching that conclusion, the Court explained "that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.* at 479. "It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.*; *see also Mellon Bank*, 960 F.2d at 1223 ("The fact that a non-resident has contracted with a resident of the forum state is not, by itself, sufficient to justify personal jurisdiction over the nonresident. The requisite contacts, however, may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties.").

Here, Gülipek Tech entered a years-long contractual relationship with Frontline, and as part of that relationship, repeatedly shipped hundreds of thousands of dollars in yarn to Frontline's Pennsylvania location and contacted Frontline via email about shipments and

payments.[4] This established vendor-purchaser relationship is far from the type of "random," "fortuitous," or "attenuated" contact that forecloses jurisdiction. *See Walden*, 571 U.S. at 285 ("[W]e have upheld the assertion of jurisdiction over defendants who have purposefully 'reached out beyond' their State and into another by, for example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State . . . ."); *cf. Burger King Corp.*, 471 U.S. at 480 (finding a single franchise agreement provided sufficient minimum contacts because "[i]n light of [the defendant's] voluntary acceptance of a long-term and exacting regulation of his business from Burger King's Miami headquarters, the 'quality and nature' of his relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated'" (quoting *Hanson*, 375 U.S. at 253)).[5]

For those reasons, the Court finds that Gülipek Tech has "purposefully directed its activities" at Pennsylvania. *O'Connor*, 496 F.3d at 317.

***Relationship to the Litigation.*** Next, the Court considers whether this litigation arises out of Gülipek Tech's contacts with the forum. *O'Connor*, 496 F.3d at 317. Again, we find that it does. In Count IV, Frontline alleges that Gülipek Tech had a duty to "secure vendor communication channels used for payment instructions, monitor for any misuse of its computer systems, vigilantly guard against theft of vendor communications, and to promptly warn law enforcement and third parties of any compromise." (Doc. No. 1 at ¶ 69.) And it claims Gülipek

---

[4] In addition to shipping products to Pennsylvania and sending communications to Pennsylvania, Plaintiff's counsel suggested during oral argument that Gülipek Tech's representatives also physically traveled to Pennsylvania to discuss the parties' relationship. (*See* July 8, 2026 Hr'g. Tr. at 27:13–19 ("Braxton . . . the local sales representative and vendor contact for Gülipek located in the United States, he had a meeting in Pennsylvania with . . . Frontline's executives already scheduled for the following day after they discovered" the fraud.).)

[5] Gülipek Tech also discusses the Supreme Court's stream-of-commerce jurisprudence (Doc. No. 25-1 at 14–15), but those cases are immaterial because Frontline does not base jurisdiction on Gülipek Tech placing products in the stream of commerce.

Tech breached those duties by "failing to maintain and enforce adequate security measures for its computer systems, failing to timely detect compromise and warn Frontline, and/or failing to assist Frontline in mitigating Frontline's losses." (*Id.* at ¶ 70.) These allegations show that Frontline's negligence claim arises out of its business relationship with Gülipek Tech and the parties' established communication chain.

Gülipek Tech disagrees, arguing that the "gravamen of Frontline's negligence claim is Gülipek's alleged failure to secure its own computer systems and detect an intrusion—acts and omissions that, even if they occurred, took place exclusively in Türkiye." (Doc. No. 25-1 at 15.) But this takes too narrow a view. Although Frontline's negligence claim certainly takes issue with the measures Gülipek Tech took (or did not take) to secure its electronic communications generally, it focuses on how those measures affected the security of Gülipek Tech's communications with Frontline specifically. For example, Frontline alleges that Gülipek Tech was the target of a hacking event in which hackers used Gülipek Tech's computer systems to monitor *communications with Frontline*. (Doc. No. 1 at ¶ 68.) And the Hackers used what they learned from Gülipek Tech's legitimate communications with Frontline to "commandeer Gülipek Tech's email system, and represent to Frontline that they were Gülipek Tech employees." (*Id.*) Although Gülipek Tech's procedures and the security of the email servers are central to Frontline's negligence claim, that claim still certainly arises out of the companies' relationship and communications—which, as noted above, were directed at Pennsylvania.

***Fair Play and Substantial Justice.*** Last, the Court considers whether "the exercise of jurisdiction otherwise comports with fair play and substantial justice." *O'Connor*, 496 F.3d at 317. Under this inquiry, we must analyze Gülipek Tech's contacts with Pennsylvania "in light of other factors," including "the burden on the defendant," the "forum State's interest in

adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." *Burger King Corp.*, 471 U.S. at 476–77 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292(1980)).

Gülipek Tech argues that "the burden on Gülipek of litigating in a distant foreign forum would be severe, while Pennsylvania's interest in adjudicating the internal cybersecurity practices of a Turkish company is minimal." (Doc. No. 25-1 at 16–17.)[6] The Court disagrees. There are undeniable burdens on Gülipek Tech if it is required to litigate Frontline's negligence claim in Pennsylvania, but Gülipek Tech remains a sophisticated business entity with international reach, and many of these burdens can be ameliorated by the use of electronic document exchange and virtual depositions. *See United States v. Wash. Grp. Int'l*, No. 04cv5555, 2006 WL 753231, at *6 (D. Idaho 2006) ("Misr Sons is a foreign corporation located outside the United States raising obvious financial and logistical difficulties resulting in this factor weighing in favor of Misr Sons. This concern, while not insignificant, is diluted somewhat by the fact that Misr Sons has sent employees to Boise, Idaho previously and that Misr Sons' employees are sophisticated business individuals."). The burden on Gülipek Tech of

[6] Gülipek Tech provides only the most cursory discussion of these factors. (Doc. No. 25-1 at 16–17.) Frontline's argument—which stretches a single paragraph and cites no case law—is only marginally better. (Doc. No. 27 at 11.) The parties are reminded that the Court may find an argument waived if it is not properly briefed. *See, e.g.*, *Burns v. SeaWorld Parks & Entmt., Inc.*, 675 F. Supp. 3d 532, 548 (E.D. Pa. 2023) ("Arguments consisting of no more than a conclusory assertion lacking supporting citations will be deemed waived." (cleaned up)); *Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506, 511 n.8 (E.D. Pa. 2007 )("Fully developed legal argument, citation to legal authority, and discussion of the relevant facts aid this Court in performing its duty, and ultimately in serving the ends of justice. Any brief in opposition or other memorandum of law that is lacking even a modicum of these elements is woefully insufficient and inexcusable." (quotation marks omitted)). Nevertheless, because the parties are equally culpable of inadequately briefing the issue, the Court will consider the issue.

litigating in Pennsylvania is also less than the burden on Frontline of litigating in Türkiye. Gülipek Tech is a single defendant within this multi-defendant suit where all the claims involve the same fraudulent scheme. There are certainly efficiencies to the parties, the witnesses, and the courts of having these claims litigated in a single suit. *See id.* ("[B]ecause the other Defendants are located here . . . this forum would be the most effective for efficient resolution of the matter.").

Accordingly, the Court concludes tht "the exercise of jurisdiction otherwise comports with fair play and substantial justice."

* * *

For those reasons, the Court finds that Frontline has with reasonable particularity stated a prima facie case of personal jurisdiction over Gülipek Tech. Gülipek Tech's motion to dismiss is denied to the extent it challenges the Court's jurisdiction.

### B. *Forum Non Conveniens*

Next, Gülipek Tech argues that this Court should decline jurisdiction under the doctrine of forum non conveniens because Türkiye is the more appropriate forum for resolving the parties' dispute. (Doc. No. 25-1 at 17–21.) Under the "doctrine of forum non conveniens . . . a federal district court may dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007); *see also Trotter v. 7R Holdings LLC*, 873 F.3d 435, 439 (3d Cir. 2017) ("The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947))). In analyzing whether dismissal is appropriate on this ground, the Court first determines whether an adequate, alternative forum exists, then considers the amount of deference owed to the plaintiff's

choice of forum, and finally balances the relevant private and public interest factors. *Delta Air Lines, Inc. v. Chimet, S.P.A.*, 619 F.3d 288, 295 (3d Cir. 2010); *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 160 (3d Cir. 2010). The defendant bears the burden of persuasion at each stage of the analysis. *Delta Air Lines*, 619 F.3d at 295; *see also Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 180 (3d Cir. 1991).

**1. <u>Adequate Alternative Forum</u>**

First, the court "must determine whether an adequate alternative forum can entertain the case." *Trotter*, 873 F.3d at 442. "The standard for 'adequate' in this context is quite low—it is generally satisfied 'where defendants are amenable to process and plaintiffs' claims are cognizable.'" *Sunline USA LLC v. Ezzi Grp.*, 708 F. Supp. 3d 585, 594 (E.D. Pa. 2023) (quoting *Kisano Trade & Invest. Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013)). "Only in the 'rare circumstances' where the alternate forum's remedy 'is so clearly inadequate or unsatisfactory that it is no remedy at all' will the alternate forum be deemed inadequate." *Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 238 (1981)).

Here, Frontline does not meaningfully dispute that Türkiye is an adequate alternative forum for litigating its negligence claim against Gülipek Tech. (Doc. No. 27 at 12 (assuming that Türkiye is an available forum).) And the Court has no trouble finding it is adequate. Gülipek Tech is domiciled in Türkiye and has agreed to accept service of process there and to recognize an appropriate Turkish court's exercise of personal jurisdiction. (Doc. No. 25-1 at 17.) And the Turkish courts are a functioning, independent judiciary fully capable of adjudicating negligence claims. (*See generally* Doc. No. 25-3 at ("Kurşat Rpt.") (describing negligence claims under Turkish law)); *see also Owens v. Turkiye Halk Bankasi A.S.*, No. 20cv02648, 2021 WL 638975, at *4–5 (S.D.N.Y. Feb. 16, 2021) (explaining that a "forum in which defendants are amenable to service of process and which permits litigation of the dispute is generally adequate"

and acknowledging that "U.S. courts have previously found that Turkey's [sic] legal system provides an adequate forum for resolution of civil disputes" (quotation marks omitted)); *Roe v. Wyndham Worldwide, Inc.*, No. 18cv1525, 2020 WL 707371, at *4 (D. Del. Feb. 12, 2020) (considering affidavit of attorney admitted to the Istanbul bar and licensed to practice law in Turkey and finding that "Defendants have established that Turkey is available as an alternative forum" to litigate the plaintiff's claims for negligence and vicarious liability). Thus, Türkiye meets the low bar for adequacy.

### 2. **<u>Degree of Deference Owed to Frontline's Forum Choice</u>**

Next, the Court determines the degree of deference owed to Frontline's choice of forum. *See Lacey*, 932 F.2d at 179–80 (explaining that a district court must indicate the amount of deference it is giving to plaintiff's choice). Because Frontline is a Pennsylvania corporation suing in its home forum, its choice is entitled to substantial deference. *See Delta Air Lines*, 619 F.3d at 295 ("[A] strong presumption of convenience exists in favor of a domestic plaintiff's chosen forum . . . ."). "This presumption exerts even greater force when," as here, "a defendant attempts to deprive a[ ] U.S. plaintiff of access to a U.S. forum." *Sunline USA LLC*, 708 F.3d at 595.[7]

### 3. **<u>Private and Public Interest Factors</u>**

Given the substantial deference owed to Frontline's choice of forum, that choice may be disturbed only if Gülipek Tech shows that "litigating the case in [Pennsylvania] would either oppress [Gülipek Tech] 'out of all proportion to the plaintiff's convenience' or cause the court

---

[7] Gülipek Tech argues that Frontline's choice should receive only minimal deference because the alleged failures to secure Gülipek Tech's systems, detect the intrusion, and warn Frontline occurred in Türkiye. (Doc. No. 25-1 at 21; Doc. No. 29 at 9.) The location of that conduct is relevant to the private and public interest factors, which are discussed below. It does not, however, eliminate the "strong presumption of convenience" given to Frontline's home forum. *Sunline USA LLC*, 708 F.3d at 595 (quoting *Windt v. Commc'ns Int'l, Inc.*, 529 F.3d 183, 190 (3d Cir. 2008)).

'administrative and legal problems.'" *Trotter*, 873 F.3d at 439 (quoting *Piper Aircraft Co.*, 454 U.S. at 241); *see also Sinochem Int'l Co.*, 549 U.S. at 429 (explaining that dismissal on forum non conveniens grounds "reflects a court's assessment of a 'range of considerations, most notably the convenience of the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality'" (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996))); *Piper Aircraft*, 454 U.S. at 255 n.23 ("As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper."). "In deciding whether a venue would oppress a defendant, courts may consider 'private interests,' such as access to proof, availability of process, and other practical issues." *Trotter*, 873 F.3d at 439 (quoting *Gulf Oil*, 330 U.S. at 508). And in "determining whether a venue would cause administrative or legal problems, courts may consider 'public interests,' such as the burdens on the courts and local juries." *Id.* The Court considers the private and public interests in turn.

*a. Private Interest Factors*

"The private interest factors include: [1] 'access to sources of proof; [2] availability of compulsory process for attendance of unwilling . . . witnesses;' [3] 'the cost of obtaining attendance of willing . . . witnesses;' [4] possibility of view of premises, if view would be appropriate to the action; and [5] all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Id.* at 442 (quoting *Gulf Oil Corp.*, 330 U.S. at 508). In evaluating these factors, courts consider the materiality of the evidence, the practical ability to obtain it, and whether litigating in the foreign forum would make resolution of the dispute materially easier, more expeditious, and less expensive. *Delta Air Lines*, 619 F.3d at 295–97.

To begin, the Court finds that neither the parties' access to proof, nor the availability of witnesses weighs in favor of dismissal. In support of these factors, Gülipek Tech argues that its

information technology infrastructure, internal security practices, and corporate records are all located in in Türkiye, as are the company's management personnel, corporate officers, directors, and employees with knowledge of those records and systems. (Doc. No. 25-2 at 3, 5–6.) These sources of evidence and witnesses are relevant to whether Gülipek Tech breached any duty owed to Frontline, and their location would seem to weigh in favor of litigating the dispute in Türkiye. *Cf. Roe*, 2020 WL 707371, at *6 (finding "greater weight is given to evidence located in Turkey" because that evidence went to liability, whereas the evidence located in the United States related to the plaintiff's damages and the other defendants' vicarious liability—issues which "'would become relevant only if Plaintiff were to succeed on liability'" (quoting *Doe*, 666 F. App'x at 184)).

That said, much of the relevant evidence will be electronic—emails, server records, electronic account data, bank records, payment information, and digital forensic materials—a fact which reduces the significance of its physical location. Such records can usually be copied and transmitted without physically transporting the evidence across international borders. *See Roe*, 2020 WL 707371, at *6 & n.5 (considering whether technology could mitigate the burden associated with presenting Turkish evidence and witnesses). Likewise, the depositions of willing witnesses can be "made easier . . . through videoconferencing," thus reducing the burden of travel. *Sunline USA LLC*, 708 F. Supp. 3d at 596; *see also id.* 596 n.4 (noting that the "physical location of witnesses has become less significant in the era of remote work").

As for unwilling witnesses, Gülipek Tech has not provided any discussion about whether their testimony could be compelled through compulsory processes other than the Court's subpoena power, such as letters rogatory, so the Court cannot adequately analyze the potential burden posed by this factor. *See Roe*, 2020 WL 707371, at *6 (finding the defendants failed to

carry their burden as to this factor because they did not discuss the availability of compulsory processes other than subpoenas and the actual expense of obtaining the testimony of voluntary witnesses).[8]

It is also noteworthy that much of the relevant evidence and at least some of the relevant witnesses are *not* located in Türkiye. For example, all of Gülipek Tech's email accounts, including Braxton's, are managed by Microsoft in *Europe*. (July 8, 2026 Hr'g. Tr. at 6:3–8 ("The servers are Microsoft servers. And our understanding is Microsoft houses its foreign e-mail systems outside of the United States. In Europe , for example, for Turkey."); *id.* at 14:18–15:8.) And Braxton—the Gülipek Tech employee whose email account was allegedly hacked and the primary contact between Frontline and Gülipek Tech throughout their relationship—is located in *Florida*. (Doc. No. 25-2 at 2; Doc. No. 27-1 at 2–5.)

If this case proceeds beyond the liability phase, it becomes even more complicated because the Court anticipates Gülipek Tech will assert multiple defenses. Notably, Gülipek Tech disputes that its systems were compromised and argues that Frontline failed to verify the payment instructions purportedly sent from Braxton's account, that the hackers' criminal conduct was a superseding cause, and that other parties' conduct caused Frontline's loss. (Doc. No. 25-1 at 23-25; Doc. No. 29 at 9, 11–12.) These defenses place at issue Frontline's payment practices, the authenticity and transmission of the emails between Frontline and the hackers/Braxton, the opening and use of the fraudulent bank account, the processing of the transfers, and the conduct of the domestic defendants. And these issues will largely be decided by evidence produced from

---

[8] During oral argument, defense counsel conceded that regardless of where the claim is prosecuted, the parties would have to comply with the Hague Convention when seeking foreign discovery. (July 8, 2026 Hr'g. Tr. at 16:21–17:5. *But see id.* at 17:8–19 (arguing without explanation that "seeking information from Turkey [sic] to come to the U.S. is much more difficult than . . . seeking information [in the United States] to go to Turkey [sic]").)

sources and witnesses located in the United States. Accordingly, the Court finds that Gülipek Tech has not shown that the access-to-proof and availability-of-witnesses factors weigh in favor of dismissal. *Cf. Delta Air Lines*, 619 F.3d at 297–300 (finding this factor weighed in favor of Italy where the moving party demonstrated that the critical disputed evidence, relevant witnesses, potentially responsible third parties, and allegedly culpable conduct were concentrated in Italy).

That leaves two private interest factors—the ease of viewing the premises and other practical problems. *See Trotter*, 873 F.3d at 442. As for the first, there is no relevant physical location that the factfinder must inspect. The alleged wrongdoing concerns computer systems, electronic communications, account-opening procedures, and financial transfers. The possibility-of-view factor is therefore neutral. *See Sunline USA LLC*, 708 F. Supp. 3d at 597 ("The ease of viewing the premises is largely irrelevant because there is no serious prospect of that happening here . . . . Instead, the lawsuit centers on alleged fraudulent business practices. This factor therefore receives no weight." (cleaned up)).

As for the second, it is undeniable that practical problems may arise if Frontline is required to litigate its negligence claim against Gülipek Tech in Türkiye while its remaining claims proceed here.[9] As discussed above, Frontline's negligence claim against Gülipek Tech principally concerns whether Gülipek Tech failed to reasonably secure or monitor its communications systems, detect the alleged intrusion, warn Frontline, or assist in mitigating Frontline's loss. (Doc. No. 1 at 15.) By contrast, the claims against the domestic financial defendants concern alleged failures in opening and monitoring the fraudulent account, processing Frontline's ACH payments, applying fraud controls, and permitting the funds to be transferred to

[9] Dismissal would not permit the entire controversy to be adjudicated in Türkiye. The domestic defendants have not consented to Turkish jurisdiction, and the claims against them will remain here.

other financial institutions. Proving Gülipek Tech's negligence would not necessarily establish the liability of any financial defendant, and the converse is also true.

Nevertheless, all of Frontline's claims concern different failures occurring at separate stages of the same fraudulent scheme, and they share certain material factual questions, including questions about how the hackers accomplished the fraud, Frontline's reliance and verification practices, the timing and processing of the six ACH payments, mitigation efforts, and the cause and amount of Frontline's loss. Thus, even though the proposed case in Türkiye against Gülipek Tech would not be identical to the case that remains here, the two proceedings would likely overlap on questions of causation, intervening conduct, comparative responsibility, mitigation, and damages. That overlap presents some risk of duplicative discovery, increased expense, and inconsistent findings. Thus, the risk of fragmentation presents practical considerations that weigh against dismissal. *See Lacey*, 932 F.2d at 182 & n.10; *cf. Eurofins*, 623 F.3d at 162–63 (finding dismissal promoted efficiency because "if the claim against [the one defendant] were to be heard in Delaware, the parties would face the substantial inconvenience of litigating two actions, which involve a common nucleus of operative facts, in two fora"); *Roe*, 2020 WL 707371, at *7 ("[U]nder the fourth factor, there is at least one practical problem that weighs in favor of dismissal. Two of the defendants . . . are not subject to the court's jurisdiction.").

* * *

In sum, the private interest factors are either neutral or weigh ever so slightly against dismissal. These factors "do not offer [Gülipek Tech] the convincing support [it] needs to overcome [Frontline's] choice of forum." *Sunline USA LLC*, 708 F. Supp. 3d at 597.

*b. Public Interest Factors*

The public interest factors also do not compel dismissal. In reviewing the public interest factors, the court "must consider the locus of the alleged culpable conduct, often a disputed issue,

and the connection of that conduct to plaintiff's chosen forum." *Delta Airlines, Inc.*, 619 F.3d at 300 (quoting *Lacey*, 862 F.2d at 42); *accord Eurofins Pharma.*, 623 F.3d at 162. Courts also consider: "the possibility of turning courts into 'congested centers;' the likelihood that the case will burden a jury composed of people with 'no relation to the litigation;' the probability that the case will 'touch the affairs of many persons' in the community; and the chances that the court will be 'at home with the . . . law that must govern the case.'" *Trotter*, 873 F.3d at 442–43 (quoting *Gulf Oil Corp.*, 330 U.S. at 508–09).

Here, Frontline alleges that Gülipek Tech owed it a duty to "secure vendor communication channels used for payment instructions, monitor for any misuse of its computer systems, vigilantly guard against theft of vendor communications, and to promptly warn law enforcement and third parties of any compromise." (Doc. No. 1 at ¶ 69.) And it claims Gülipek Tech breached those duties by "failing to maintain and enforce adequate security measures for its computer systems, failing to timely detect compromise and warn Frontline, and/or failing to assist Frontline in mitigating Frontline's losses." (*Id.* at ¶ 70.) It is difficult to pin down from the Complaint where this "culpable conduct" occurred. Did it occur in Türkiye because that is where the employees who maintained and enforced the relevant security measures are located? Or is it more accurate to find it occurred in the United States because that is where Braxton resides, and Frontline received the hacked emails from there? Given the amorphous nature of online systems and the international nature of the parties' business relationship, we ultimately find the correct answer to be somewhere in the middle. *Cf. Delta Air Lines, Inc.*, 619 F.3d at 300 ("The factual issues at the center of this dispute . . . all involve whether Chimet declared the value of the shipment when it delivered the platinum to Delta in Italy. The circumstances under which the shipment of cargo was lost in Pennsylvania are not relevant to determining whether

Delta's liability is limited under the Montreal Convention."). This factor weighs neither for nor against dismissal.

None of the remaining public interest factors moves the needle either. Neither party offers meaningful evidence comparing the relative congestion of this Court and the appropriate Turkish court. *Roe*, 2020 WL 707371, at *7 ("Defendants presented no evidence regarding court congestion or average time to trial in Turkey. Accordingly, I cannot fairly conclude that court congestion favors transfer."). There is no dispute concerning the law applicable to Count IV. Both parties analyze Frontline's negligence claim under Pennsylvania law and agree that Pennsylvania law governs. (*See* Doc. No. 35 (describing an "analytical structure . . . resolved entirely under Pennsylvania negligence law"); Doc. No. 37 at 1 ("Pennsylvania law governs Count IV.").) Because this Court is more familiar with Pennsylvania law than a Turkish court would be, the applicable-law consideration weighs against dismissal.

Finally, the Court notes that both Türkiye and Pennsylvania have legitimate interests in the dispute. Türkiye has an interest in regulating the internal cybersecurity practices of a Turkish corporation and adjudicating allegations that Turkish personnel failed to adequately secure or monitor systems there. *See Sunline USA LLC*, 708 F. Supp. 3d at 597–98 ("Court recognize that jurisdictions bear responsibility for policing businesses within their borders for wrongdoing, wherever it may occur."). And Pennsylvania has a legitimate interest in providing a forum in which a resident business can seek redress for an injury allegedly caused by a foreign company's failure to reasonably secure the communications that it directed into the Commonwealth. *See id.* at 598 ("[T]he United States has an equally compelling interest in ensuring that foreign businesses engaging with the U.S. market do so lawfully.") It is unclear whether Frontline would be entitled to have its claim heard by a jury if this case were to proceed in Türkiye. But

even if it were, requiring citizens of either jurisdiction to serve as jurors would not be unfair given that the events at issue are of interest to both jurisdictions. *See id.* at 600 ("Pennsylvania is not only related to this suit, but it is also the locus of the alleged culpable conduct. Therefore, it would not be unfair to have Pennsylvania residents serve as jurors in the instant case."). The local interest and jury-duty considerations are in equipoise.

* * *

As with the private interest factors, the public interest factors are either neutral or weigh ever so slightly against dismissal. Gülipek Tech has not shown that the "public interest factors lean so far in [its] direction such that we must dismiss [Frontline's] complaint." *Id.*

**4. Summary**

In sum, Türkiye provides an adequate, alternative forum, but Gülipek Tech has not carried the heavy burden necessary to overcome the strong presumption of deference afforded to Frontline's choice of forum. The private and public interest factors are either neutral or weigh slightly against dismissal. Accordingly, Gülipek Tech's motion to dismiss on forum non conveniens grounds is denied. *See Roe*, 2020 WL 707371, at *8.

**C. Failure to State a Claim**

Having found that Gülipek Tech is subject to the Court's jurisdiction and that jurisdiction is appropriately exercised in this case, we must now consider Gülipek Tech's contention that Count IV should nevertheless be dismissed because Frontline has failed to state a plausible claim for negligence. (Doc. No. 25-1 at 21–26.) Gülipek Tech argues that Count IV fails as a matter of law because Frontline has not alleged facts that show Gülipek Tech owed it a duty of care. (*Id.*) We agree.[10]

[10] Gülipek Tech also argues that Count IV fails because the hackers' criminal acts constitute an intervening cause and the claim is barred by Pennsylvania's economic loss doctrine. (Doc. No. 25-1 at

To state a claim for negligence in Pennsylvania, a plaintiff must allege "that the defendant had a duty to conform to a certain standard of conduct; that the defendant breached that duty; that such breach caused the injury in question; and actual loss or damage." *Chemalloy Co., LLC v. Citibank*, *N.A*., 606 F. Supp. 3d 370, 376 (E.D. Pa. 2022) (citing *Wisniski v. Brown & Brown Ins. Co*., 906 A.2d 571, 575 (Pa. Super. Ct. 2006)). Here, the issue is whether Gülipek Tech owed Frontline a duty of care. And "[t]he question of whether a duty exists is a question of law for the court to decide." *Shooter Pops LLC v. Wells Fargo Bank, N.A.*, 649 F. Supp. 3d 62, 68 (E.D. Pa. 2023) (quotation marks omitted).

Gülipek Tech argues that Frontline's negligence claim fails as a matter of law because "no Pennsylvania court has recognized a legal duty owed by a foreign vendor to a domestic purchaser to maintain cybersecurity sufficient to prevent third-party criminals from impersonating the vendor." (Doc. No. 25-1 at 22.) Frontline disputes this characterization, responding that the "Pennsylvania Supreme Court has specifically rejected a categorical no-duty rule and held that an entity that affirmatively creates the risk of a foreseeable cyber intrusion may owe a duty of reasonable care." (Doc. No. 27 at 14 (citing *Dittman v. UPMC*, 196 A.3d 1036, 1047 (Pa. 2018)).) But *Dittman*'s holding is not as straightforward as Frontline suggests.

In *Dittman*, a group of employees filed a putative class action against their employers, the University of Pittsburgh Medical Center ("UPMC") and UPMC McKeesport (collectively, "UPMC"). 196 A.3d at 500. The employees alleged that UPMC's computer system had been breached, allowing hackers to access and steal the "personal and financial information, including names, birth dates, social security numbers, addresses, tax forms, and bank account information

---

21–26.) Because the Court finds that Gülipek Tech did not owe Frontline a cognizable duty of care under the facts alleged here, we need not address these alternative arguments.

of all 62,000 UPMC employees and former employees." *Id*. at 500. They brought negligence claims against UPMC, arguing that it owed them a duty to exercise reasonable care when it took the affirmative steps of "collecting Employees' sensitive personal data and storing it on [UPMC] internet-accessible computer systems." *Id.* at 509. This duty, according to the employees, included implementing "measures to protect them from the foreseeable risk that third parties would attempt to access and pilfer that information." *Id*. UPMC moved for dismissal of the complaint, arguing that the employees were proposing "a radical reconstruction of duty," which would impose liability on UPMC for its nonfeasance. *Id.* at 511–12.

The Pennsylvania Supreme Court disagreed with UPMC. The court began by noting that "in scenarios involving an actor's affirmative conduct, [the actor] is generally under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." *Id.* at 513 (quoting *Seebold*, 57 A.3d at 1246). The court noted that this duty was recognized at common law and "appropriately undergirds the vast expanse of tort claims in which a defendant's affirmative, risk-causing conduct is in issue." *Id.* (quoting *Seebold*, 57 A.3d at 1246); *see also* Restatement (Second) of Torts § 302, cmt. a (1965) ("Anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act."). In the case before the court, UPMC's affirmative conduct included requiring employees to provide "sensitive personal data" and storing that data on its systems. *Dittman*, 196 A.3d at 515. And because it was foreseeable that a "cybercriminal might take advantage of the vulnerabilities in UPMC's computer system and steal Employees' information," UPMC had a duty to implement "adequate security measures to protect against data breaches." *Id.*

Here, unlike the employer in *Dittman*, there is nothing to suggest that Gülipek Tech took the type of "affirmative, risk-causing conduct" that warrants the imposition of a heightened duty. Indeed, the only "affirmative conduct" that can be attributable to Gülipek Tech is that it emailed a known customer about invoices and its expectation of opening a new bank account. Gülipek Tech did not accept payment through email, nor did it collect or store Frontline's financial data or other sensitive information. This situation is thus a far cry from the one presented in *Dittman* and those cases that rely on it. *See, e.g.*, *Dittman*, 196 A.3d at 513–14 ("[A]s a condition of employment, UPMC *required* [its employees] to provide certain personal and financial information, which UPMC *collected and stored* on its internet-accessible computer system without use of adequate security measures, including proper encryption, adequate firewalls, and an adequate authentication protocol. These factual assertions plainly constitute affirmative conduct on the part of UPMC." (emphases added)); *In re Wawa, Inc. Data Sec. Litig.*, No. 19cv6019, 2021 WL 1818494, at *7 (E.D. Pa. May 6, 2021) ("[T]he Institutions have sufficiently pled a claim for negligence based on their allegations that Wawa's affirmative conduct, in *collecting payment card information and storing it in an insecure manner*, created a risk of foreseeable harm from third parties and led to a data breach that proximately caused the Institutions' alleged injuries." (emphasis added)); *Tjahjono v. Westinghouse Air Brake Tech Corp.*, No. 23cv531, 2024 WL 1287085, at *6 (W.D. Pa. Mar. 26, 2025) ("Numerous courts have recognized that there is a duty to protect [personal identifying information] that is entrusted either as incidental to employment or to a consumer relationship.").[11] Given these differences,

[11] As this Court explains in the Memorandum deciding Defendant TD Bank's motion to dismiss, district courts in this Circuit have been leery of reading *Dittman* in a way that results in any "act," no matter how routine or minor, being viewed as "affirmative conduct." *See, e.g.*, *Fragale*, 480 F. Supp. 3d at 669 (predicting the Pennsylvania Supreme Court would not "impose a duty on a bank to a noncustomer" for the opening of an account and subsequent transfer of funds).

this Court finds that the Pennsylvania Supreme Court likely would not find the duty outlined in *Dittman* governs this action.

When there is no recognized, preexisting duty under Pennsylvania law, courts consider five factors to determine whether a duty nevertheless exists in a specific case. *See Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, (Pa. 2000) (explaining that "[t]he determination of whether a duty exists in a particular case involves the weighing of several discrete factors"); *Fragale*, 480 F. Supp. 3d at 664 ("In *Althaus*, the Pennsylvania Supreme Court established a five-factor policy test for courts to apply when considering whether a particular set of facts warrants imposing a duty where such a duty was not previously recognized."); *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 13 (Pa. 2019) (describing consideration of the *Althaus* factors as "required when imposing a previously unarticulated common law duty"). Those factors are: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus*, 756 A.2d at 553. "While no individual factor is dispositive, 'a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant.'" *Citizens Bank of Pa. v. Reimbursement Techs., Inc.*, 609 F. App'x 88, 92 (3d Cir. 2015) (quoting *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008–09 (Pa. 2003)); *cf. Feleccia*, 215 A.3d at 13 ("Courts should not enter into the creation of new common law duties lightly . . . . The Court has previously adopted the default position that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, we will not impose new affirmative duties." (quotation marks omitted)).

Frontline does not meaningfully discuss the *Althaus* factors, relegating their discussion to two sentences in a footnote:

> Even if the Court applies the *Althaus* factors, the result is the same. The parties had a direct commercial relationship; the social utility of insecure payment-instruction practices is minimal; the risk and foreseeability of harm from business-email-compromise fraud are obvious; the duty Frontline proposes is limited to ordinary reasonable care over official payment channels and warnings to known counterparties; and the public interest favors precisely that narrow rule.

Doc. No. 27 at 15 n.4. Frontline's failure to meaningfully discuss the factors or cite any authority supporting its position renders its argument on this point waived. *See, e.g.*, *Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008) ("[T]he District Court found that Dreibelbis had ample opportunity to make this argument in response to defendants' motion to dismiss and failed to do so. Accordingly, the District Court exercised sound discretion when it refused to consider an argument that, in effect, had been waived."); *Burns*, 675 F. Supp. 3d at 548 ("Arguments consisting of no more than a conclusory assertion lacking supporting citations will be deemed waived." (cleaned up)); *Anthony*, 535 F. Supp. 2d at 511 n.8 (E.D. Pa. 2007 )("Fully developed legal argument, citation to legal authority, and discussion of the relevant facts aid this Court in performing its duty, and ultimately in serving the ends of justice. Any brief in opposition or other memorandum of law that is lacking even a modicum of these elements is woefully insufficient and inexcusable." (quotation marks omitted)).

Even if Frontline had properly addressed the *Althaus* factors, the Court would still find that they, on balance, do not warrant the imposition of a duty under the facts of this case. Although the parties have an established business relationship (factor 1), there is minimal benefit to society (factor 2) from requiring businesses to take on the time and expense of securing every online communication that they have with customers, including communications that do not

contain the customer's sensitive information. The potential risk (factor 3) is purely financial, a fact that weighs against imposition of a duty. *See Chemalloy Co.*, 609 F. Supp. 3d at 378. And we cannot say that it is foreseeable (factor 3) that a criminal hacker would use those non-sensitive communications to misdirect *customer* funds. The consequences of imposing a duty (factor 4) are not limited. To the contrary, imposing a duty here would essentially require every business to ensure the security of every communication with a customer about payment, no matter how trivial or risk liability if an unknown third party hacks into the server and uses the information within the communication to defraud the customer. The Court also has little trouble finding that Frontline, as the company that wired funds to the hacker's account, was in the best position to confirm the invoices were authentic and to prevent their loss (factor 4). *See id.*; *Fragale*, 480 F. Supp. 3d at 667–68. Given that Frontline wired nearly six times the amount that it owed Gülipek Tech, it does not appear to have taken *any* steps to confirm the validity of the payment requests. Last, we find that there is little public interest in the proposed solution (factor 5). When considering this factor, courts often "look[ ] at other court's decisions in different jurisdictions as persuasive authority as to where the public interest lies." *Fragale*, 480 F. Supp. 3d at 668 (quoting *Gillen v. Boeing Co.*, 40 F. Supp. 3d 534, 541 (E.D. Pa. 2014)). But Frontline has not identified any cases that impose such a far-reaching duty in similar circumstances, and the Court's independent research has not uncovered any case that recognizes a duty to protect non-sensitive business communications.

In sum, Gülipek Tech did not owe Frontline a cognizable duty under the circumstances alleged in this case. Because Gülipek Tech did not owe a duty of care to Frontline, Frontline's negligence claim fails as a matter of law. Gülipek Tech's motion to dismiss is granted as to Count IV.

## IV. CONCLUSION

For the reasons discussed above, the Court has jurisdiction over Frontline's negligence claim against Gülipek Tech, and it is appropriate for the Court to exercise that jurisdiction. However, Frontline has failed to state a claim for negligence, so the motion to dismiss is granted on that ground. And because Gülipek Tech did not, as a matter of law, owe Frontline a duty of care under the circumstances presented here, amendment would be futile, and Count IV is dismissed with prejudice.